UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL SIGN AND SIGNAL,
        Appellant,

No. 1:08-cv-155

-v-

HONORABLE PAUL L. MALONEY

JAMES R. LIVINGSTON,
        Appellee.

## *AMENDED* OPINION AND ORDER REVERSING JUDGMENT OF BANKRUPCTY COURT

      National Sign and Signal appeals an adverse decision in favor of James Livingston rendered in the bankruptcy court.

## JURISDICTION AND STANDARD OF REVIEW

      The district court has jurisdiction over this appeal under 28 U.S.C. § 158(a)(1) and (c)(1). National Sign and Signal timely filed a notice of appeal and elected to have the district court, rather than the bankruptcy appellate panel, hear the appeal. When considering an appeal of a decision issued by a bankruptcy court, the district court applies the clearly erroneous standard when reviewing findings of fact. *In re Gardner*, 360 F.3d 551, 557 (6th Cir. 2004); *In re Federated Dep't Stores, Inc.*, 270 F.3d 994, 999 (6th Cir. 2001). A factual finding is clearly erroneous when, although there is evidence to support the finding, "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed'". *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Questions of law are reviewed under the *de novo* standard. *In re Gardner*,

*amended on Page 10 to correct a typo in block quote.

360 F.3d at 557; *In re Federated Dep't Stores, Inc.*, 270 F.3d at 999. On appeal, the district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. FED. R. BANKR. P. 8013.

## BACKGROUND

The bankruptcy court included findings of fact in its opinion. *In re Livingston*, 379 B.R. 711, 715-16 (Bankr. W.D. Mich. 2007). National Sign and Signal (NSS or Appellant) manufactures illuminated street and traffic signs. Most of its products are used in public projects. NSS generates sales by working with the consultants, who compete for those public projects. NSS relies upon consultants to incorporate its products into their bids. NSS had particularly close ties with three consulting firms: Carrier & Gable, C.J. Hood Company, and Traffic Products. NSS had written agreements with two of the three consultants. The contracts were terminable at will, by either party, with 30 days notice. By 1995, Carrier and Gable and Traffic Products had been incorporating NSS products into their bids for 15 years and C.J. Hood Company had been incorporating NSS products into its bids for 10 years.

James Livingston was a longtime employee of NSS and eventually became a vice president. Included among his responsibilities was the management of the business generated by the consultants. In 1995, Mr. Livingston and NSS parted ways. Mr. Livingston and several others, who also left NSS, promptly started a new company, Traffic Sign Technology, Inc., which competed with NSS.

On October 31, 1995, NSS filed suit in Circuit Court of Calhoun County, Michigan, against Livingston and the other former employees, as well as their new company. The complaint alleged, during their employment with NSS,

2

the individual Defendants had access to Plaintiff's trade secrets and confidential and proprietary business information, including but not limited to, Plaintiff's customer lists, marketing strategies and techniques, pricing lists, vendor and supplier lists, manufacturing techniques, blueprints and designs, and financial information.

(Verified Compl. ¶ 6.)  The complaint further alleged

8.   Upon information and belief, Defendants have made and will make use of Plaintiff's confidential and proprietary information, and Plaintiff's trade secrets, to market and sell Plaintiff's traffic signs and signals and to compete against Plaintiff. 9.   By the aformentioned intentional and willful course of conduct, Defendants have and will injure Plaintiff and its business and property, cause Plaintiff to lose profitable sales and customers, cause Plaintiff to lose the value of its trade secrets and confidential and proprietary information and cause Plaintiff to lose customers.

10.   Defendants' continuing course of conduct has inflicted, and will continue to inflict, irreparable injury to Plaintiff's business and property unless preliminary and permanent injunctive relief is obtained.

(*Id.* ¶¶ 8-10.)

The complaint alleged five claims: (1) breach of fiduciary duty, (2) misappropriation of trade secrets, (3) grossly negligent mismanagement, (4) tortious interference with a business relationship, and (5) unfair competition.   Three counts were presented to the jury: (1) breach of fiduciary duty, (2) interference with a business relationship, and (3) misappropriation of trade secrets.   On October 20, 1997, the jury found in favor of NSS and against Mr. Livingston on all three counts.   (Verdict Form.)   Although the jury found Mr. Livingston misappropriated trade secrets, the jury also found NSS did not suffer any economic damage from the misappropriation.   (*Id.*)   The jury awarded NSS $1,800,000.00 in damages.[1]   (*Id.*)

Eight years later, on October 25, 2007, Livingston filed for voluntary Chapter 7 bankruptcy. NSS filed a complaint asserting the non-dischargeability of debt.   The complaint asserts Mr.

---

[1]Mr. Livingston, his new company Traffic Sign Technology, and a co-defendant were found jointly and severally liable for the damages.  (Nov. 10, 1997 Order.)

Livingston owes NSS $1,800,000.00 as the result of the judgment in state court. (Nondischargeability Compl. ¶30.)    NSS claims the debt owed to it by Livingston is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (4), and (6).  (*Id.* ¶¶ 31-34.)  NSS filed a motion for summary judgment, which was denied.  At trial, the parties presented no witnesses and instead relied on testimony given by the witnesses in the underlying prior state court action.  The bankruptcy judge found in favor of Mr. Livingston, holding the debt was dischargeable and did not fall under any of the exceptions alleged by NSS.  *In re Livingston*, 379 B.R. at 728.  NSS appeals that decision.

<u>ANALYSIS</u>

The Bankruptcy Code contains exceptions limiting debts that may be discharged as part of the bankruptcy process.  NSS argues the money Livingston owes falls under several of those exceptions.  NSS asserts Livingston's financial obligation falls under three of the exceptions found under 11 U.S.C. § 523.  Under § 523(a), an individual's debt may not be discharged if the debt is

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by - -
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition;
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a).  In order for a debt to be nondischargeable, the debt must fall under one of the exceptions alleged by NSS.  Creditors bear the burden of proving, by a preponderance of the evidence, that a debt is excepted from discharge under § 523(a).  *In re Meyers*, 196 F.3d 622, 624 (6th Cir. 1999).  "As a general matter, exceptions to discharge are narrowly construed to promote the central purpose of discharge: relief for the 'honest but unfortunate debtor.'" *Id.* (quoting *Grogan*

4

*v. Garner*, 498 U.S. 279, 287 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934))).

The bankruptcy judge found the debt did not fall under any of the three exceptions. *In re Livingston*, 379 B.R. at 728. The court concluded subsection (a)(2) did not apply because Livingston did not obtain any property as the result of his fraudulent conduct. *Id.* at 716-17. Subsection (a)(4) did not apply because the record lacked evidence that Mr. Livingston embezzled the relationships or contracts NSS had with its consultants. *Id.* at 717. Finally, the court concluded subsection (a)(6) did not apply under either the entity or the property prong of the subsection. *Id.* at 717-21. In his (a)(c) analysis, the bankrtupcy judge held that Mr. Livingston did not cause an injury to NSS' property because NSS had no enforceable rights in the object of Livingston's tortious conduct. *Id.* at 718-19. The court explained the jury in the underlying case found Livingston guilty of the tort of interfering with a business relationship, not tortious interference with a contract. *Id.* Second, the court concluded Mr. Livingston's conduct did not injure NSS. *Id.* at 719-21.

NSS alleges five errors in the bankruptcy judge's decision. Each alleged error is addressed below.

A. Did NSS' business relationships with Carrier & Gable, C.J. Hood Company, and Traffic Products constitute property obtained by fraud?

Under § 523(a)(2)(A), a debt is not dischargeable if that debt is for property obtained by fraud.[2] The bankruptcy judge concluded "there is no evidence that Mr. Livingston gained any property from NSS as the result of his deceit. At most, the record establishes that two consultants,

---

[2]NSS does not assert the business relationships constitute money, services or credit. *See* 11 U.S.C. § 523(a)(2). The bankruptcy judge concluded Livingston was collaterally estopped from denying that his conduct constituted fraudulent behavior. *In re Livingston*, 379 B.R. at 716.

Carrier & Gable and Traffic Products, terminated their relationship with NSS because of solicitations made by Mr. Livingston while he was still employed by NSS." *In re Livingston*, 379 B.R. at 717. NSS argues this conclusion is erroneous. NSS asserts the business relationships NSS had with the two consultants constitute property. NSS also claims the record establishes that the consultants left NSS as a result of Mr. Livingston's fraudulent solicitations.

NSS has not established that Livingston *obtained* any property as the result of his fraudulent behavior.[3] The bankruptcy court's adverse conclusion on this issue rests not on the word "property," but on the word "obtain." "Obtain" means "to come into possession of; get, acquire." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1138 (2003). *See also United States v. Lucas*, 68 F.3d 475, 1995 WL 598403 at * 8 (6th Cir. Oct. 10, 1995) (unpublished table opinion) (per curiam) (defining "obtain" as "to get hold of by effort; to get possession of; to procure; to acquire, in any way" (quoting BLACK'S LAW DICTIONARY (6th ed. 1990))). In its discussion of § 523(a)(2)(A), the bankruptcy court did not conclude the business relationships did not constitute property. *See In re Livingston*, 379 B.R. at 716-17. The bankruptcy court concluded the debt did not fall under the exception because the record did not show that Mr. Livingston obtained property as the result of his deceitful conduct. *Id.* at 717.

NSS' claim on this issue asserts the bankruptcy court erred on a question of law. However,

---

[3]In the second sentence of a portion of NSS' brief on this issue, NSS asserts the record establishes that, as a result of the fraud, the Debtor obtained NSS' contractual and business relationships with the two consultants. (Appellant's Br. 3.) NSS does not cite any portion of the record to support this claim. Further down the page, NSS argues "the testimony of Carrier, Kennedy and Hood demonstrates the Debtor intended to establish a business which would compete with his employer and actively solicited his employer's Consultants in order to do so." (*Id.*) This statement does not assert Mr. Livingston succeeded in his attempts to solicit his employer's consultants. The court will not scour the three depositions to determine where this testimony occurred.

6

the bankruptcy court's conclusion rests on an issue of fact, not a question of law. NSS does not reference any evidence in the record to contradict the bankruptcy court's conclusion. The fact that NSS lost business relationships as the result of Mr. Livingston's deceitful conduct does not necessarily lead to the conclusion that Mr. Livingston or his company gained those business relationships as the result of his deceitful conduct. NSS has not established the bankruptcy court's factual conclusion was clearly erroneous.

B. Did Mr. Livingston embezzle NSS' business relationships with Carrier & Gable, C.J. Hood Company, and Traffic Products?

Under § 523(a)(4), a debt is not dischargeable if it is the result of embezzlement.[4] The bankruptcy judge found Mr. Livingston did not embezzle NSS' business relationships. The court explained "[a]t best, the only property that Mr. Livingston could have arguably embezzled were the two contracts NSS had with Carrier & Gable and Traffic Products, Incorporated. Nothing, though, suggests Mr. Livingston 'took' either of those two contracts from NSS. Rather, it appears each contract was simply terminated by one party or the other." *In re Livingston*, 379 B.R. at 717.

NSS argues the bankruptcy court's resolution of this issue was erroneous. NSS argues Livingston interfered with its business relationships with its consultants. NSS contends Livingston embezzled the business relationships with the contracts because he diverted those business opportunities for his own benefit, as part of his effort to establish his own business. NSS insists, the jury in the underlying state action "determined the Debtor fraudulently diverted NSS's property

---

[4]The bankruptcy court noted NSS' claim could not fall under the fiduciary portion of this exception because the Sixth Circuit Court of Appeals has limited the application of the fiduciary portion of this exception to fiduciary responsibilities associated with an express or technical trust. *In re Livingston*, 379 B.R. at 717 n. 8 (citing *In re Blaszak*, 397 F.3d 386, 391 (6th Cir. 2005). NSS does not assert the fiduciary portion of the exception applies.

interests for his own use." (Appellant's Br. 5.) NSS also argues the holding in *In re Sullivan*, 305 B.R. 809 (Bankr. W.D. Mich. 2004) supports the conclusion that diverting a business opportunity can constitute the embezzlement of property.

NSS has not established the bankruptcy court's holding was clearly erroneous. NSS does not point to any portion of the record to support its assertion that the state court found Mr. Livingston diverted the business relationships for his own use. The only evidence in the record to which NSS might be referring is the jury verdict form. The jury did find that Livingston "unlawfully interfered with [a] business relationship or expectancy [NSS] had with customers." (Verdict Form - Question 9.) That evidence does not support NSS' assertion that Livingston diverted the business relationship or expectancy for his benefit. NSS bears the burden to establish the elements of its claims in its nondischargeability complaint by a preponderance of the evidence. This evidence, the verdict form, does not establish the bankruptcy judge's conclusion was clearly erroneous.

NSS has not established the bankruptcy court's holding was contrary to law. To establish a debt is not dischargeable under the embezzlement provision of § 523(a), a "creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *In re Brady*, 101 F.3d 1165, 1173 (6th Cir. 1996) (citing *In re McDowell*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)). In order to "appropriate" the property, the debtor "must exercise control over or take possession of property." *In re Holdaway*, 388 B.R. 767, 778 (Bankr. S.D. Tex 2008) (defining "appropriate" in the context of § 523(a)(4) (quoting *In re Davenport*, 353 B.R. 150, 200 (Bankr. S.D. Tex. 2006))); *see* BLACK'S LAW DICTIONARY 110 (8th ed. 2004) (defining "appropriation" as "the exercise of control over property; a taking of possession"); *United States v. Zauber*, 857 F.2d 137,

147 (3d Cir. 1988) (defining "appropriate" as "to take possession . . . to set apart for or assign to a particular purpose or use . . . to take or make use of without authority or right" (quoting WEBSTER'S NEW COLLEGIATE DICTIONARY 56 (1977 ed.))).  NSS has not established that Livingston ever "appropriated" the business relationship, as that word has been defined.  NSS has not demonstrated how Mr. Livingston exercised control or took possession of the relationships it had with the two consultants.

The holding in NSS' authority, *In re Sullivan*, supports the bankruptcy judge's determination. The facts in *Sullivan* are similar, but not identical, to the facts here.  In *Sullivan*, the defendant, while acting as president of one company, contacted a potential client, ASR Corporation, to discuss future business opportunities.   At the same time, the defendant was also investigating employment opportunities with ASR.  ASR asked the defendant if his employer could conduct a "needs analysis." The debtor met with ASR in an effort to promote opportunities for the two companies to do business, but the exchanges following the meeting focused on the defendant's potential opportunities with ASR.  Several months later, the defendant began to form his own company that would compete with his employer.  The defendant, acting on behalf of his new company, even though he had not yet tendered his resignation to his existing employer, contacted ASR.  The defendant eventually resigned and two days later, on behalf of his new company, submitted a proposal to ASR to conduct a "needs analysis."  The defendant's new company and ASR entered into a contract and the new company earned approximately $400,000.00 for its work.  The debtor later filed for bankruptcy, and his former company commenced an adversary proceeding against him.

The bankruptcy judge addressed whether Sullivan's debts were non-dischargeable under the embezzlement provision of § 523(a)(4).  *In re Sullivan*, 305 B.R. at 825-27.  At issue was whether

9

"*intangible* property, such as a business opportunity, [could] be embezzled for purposes of § 523(a)(4)." *Id.* at 826 (emphasis in original). Reviewing the history of the tort of conversion and the types of property subject to the tort, the bankruptcy judge found "there is no cogent reason to exclude intangible property from the coverage of the statute. A creditor, in this instance an employer, can be cheated or deprived of intangible property just as easily as tangible personal property or money." *Id.* The bankruptcy judge then reached a narrow conclusion.

> Although the undersigned judge believes that any expansion of the meaning of "property" to include intangibles in the embezzlement context may be subject to some criticism, the facts in this case warrant a conclusion that the Debtor appropriated to his own use property (a concrete corporate opportunity) that was entrusted to him (in his capacity as President) in a fraudulent (secretive and unwarranted) manner.

*Id.* The bankruptcy judge, however, limited the amount of debt that was nondischargeable to $15,930 under § 523(a)(2)(A), (4) and (6). *Id.* at 827.

The facts here differ from the facts in *Sullivan* in an important way. In *Sullivan*, the creditor established a factual basis for the "concrete corporate opportunity" that was embezzled. Because the business opportunity, the "needs analysis" proposed by ASR, was concrete, the business opportunity was intangible property that was embezzled by the debtor. Here, NSS has not identified any "concrete corporate opportunity." NSS has not identified any specific construction project its consultants secured. NSS has not provided any evidence that Livingston became aware of a particular (concrete) construction project while working for NSS for which his new company later provided signs or traffic signals. Under the reasoning in *Sullivan*, NSS has not established the existence of any property which might have been appropriated. Without some concrete corporate opportunity established in the record, there was no intangible property for Livingston to embezzle.

10

C.  Did Mr. Livingston cause a willful and malicious injury to NSS or to NSS' property?

Under § 523(a)(6), a debt is not dischargeable if it was the result of a willful and malicious injury to an entity or a willful and malicious injury to the property of an entity.[5]  Following the Supreme Court's decision in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the Sixth Circuit Court of Appeals held the test for determining if an injury is willful and malicious under § 523(a)(6) is whether the actor desired to cause the consequences of his or her act or believed that the consequences of the act were substantially certain to result from it.  *In re Markowitz*, 190 F.3d 455, 464 (6th Cir. 1999) (quoting, in part, Restatement (Second) of Torts § 8A, at 15 (1964)); *see also In re Kennedy*, 249 F.3d 576, 580 (6th Cir. 2001) (describing the holding in *Markowitz*).  The words "willful" and "malicious" both modify "injury" and require separate consideration under § 523(a)(6).  *See Markowitz*, 190 F.3d at 463 ("the judgment must be for an injury that is both willful and malicious.  The absence of one creates a dischargeable debt.").  An "injury" is "[t]he violation of another's legal right, for which the law provides a remedy; a wrong or injustice."  Black's Law Dictionary 801 (8th ed. 2004).  The word "willful" modifies the word "injury" "indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."  *Geiger*, 523 U.S. at 61 (emphasis in original).  "Malicious" also modifies "injury" indicating the injury must have occurred "in conscious disregard of one's duties or without just cause or excuse."  *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).

When determining whether a debt falls under the § 523(a)(6) exception, courts should

---

[5]The bankruptcy court held Livingston was collaterally estopped from denying that his conduct was willful and malicious because the jury in the underlying state court proceedings found he intentionally interfered with NSS' business relationships.  *In re Livingston*, 379 B.R. at 717-18.

carefully identify the injury to the creditor or the creditor's property.  *See In re Russell*, 262 B.R. 449, 454 (Bankr. N.D. Ind. 2001) ("the true inquiry is not the unique or case specific damages that are somehow monetized and then memorialized in a money judgment.  Those damages are only the manifestation of the true injury.").  The Sixth Circuit explained, in order for the debt to fall under the § 523(a)(6) exception,

> the injury must invade a creditor's legal rights.  Section 523(a)(6)'s term "willful . . . means deliberate or intentional invasion of the legal rights of another, because the word 'injury' usually connotes legal injury (*injuria*) in the technical sense, not simply harm to a person." The conduct "must be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from . . . legal rights.  Moreover, knowledge that legal rights are being violated is insufficient to establish malice. . . ."

*In re Best*, 109 F.App'x 1, 6 (6th Cir. 2004) (unpublished) (alterations in *Best*) (citations omitted).  In order to show the debt owed falls under § 523(a)(6), the creditor must prove, by a preponderance of the evidence that (1) the debtor's conduct was willful and malicious, (2) it suffered an invasion of its legal rights or to the legal rights to its property, and (3) the invasion was caused by the debtor's conduct.  *In re Little*, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005).  The issue here is the second element, whether NSS suffered an invasion of its legal rights or of its legal rights to its property.

The bankruptcy court examined both the entity and property prongs of the willful and malicious injury exception and concluded the debt did not fall under either prong.  NSS disagrees.  In the third issue raised in its brief, NSS argues the business relationships and contracts with the consultants constitute property.[6]  In the fourth issue raised in its brief, NSS argues Livingston's

---

[6]The third issue raised in NSS' brief is perplexing.  It is unclear whether the third issue addresses the embezzlement exception, § 523(a)(4), or the willful and malicious exception, § 523(a)(6).  NSS phrases the issue in the caption as one falling under the embezzlement exception. In its caption introducing the issue, NSS argues "The Trial Court Erred in its Conclusion of Law that Debtor's Fraudulent Inducement of Carrier & Gable and Traffic

willful and malicious conduct caused harm to it.[7]

          1.  Willful and Malicious Injury to NSS' Property

Addressing the injury to property prong, the bankruptcy court noted the debt arose as the result of interference with "unenforceable business relationships," not "from the separate tort of tortious interference with contract" and the "latter must involve interference with enforceable rights whereas the former need not." *In re Livingston*, 379 B.R. at 718. Because the jury found Mr. Livingston interfered with a business relationship, rather than a contract, the court concluded the debt did not arise as the result of willful and malicious injury to NSS' property. *Id.* at 719.

NSS asserts the bankruptcy court erred when it defined property as an interest enforceable under the law. NSS insists the distinction between tortious interference with a business relationship and tortious interference with a contract is a red herring. NSS states in its brief "'[p]roperty as that term is defined under Section 541(a)(1) of the Code includes all of the debtor's legal and equitable interests enforceable under the law. *US v. Craft*, 535 US 274; 122 S Ct 1414 (2002) . . . . The *Craft* court described property as a 'bundle of sticks - a collection of individual rights which, in certain

_____

Products, Inc. to Terminate Their Contracts with National Sign and Signal Did Not Constitute Embezzlement of those Long-Standing Business Relationships?" (Appellant's Br. 6.) However, in this portion of the brief, NSS curiously asserts the "Debtor is liable for embezzlement of NSS's property pursuant to 11 USC § 523(a)(6)." (*Id.*) Under this third issue, NSS references a portion of the bankruptcy court's opinion in which he describes the business relationship as "unimportant" and unenforceable." Those words are located in the bankruptcy court's discussion of the § 523(a)(6) exception, not under the court's discussion of § 523(a)(4). To the extent the testimony cited by NSS (Appellant's Br. 6), applies to the embezzlement exception, on the pages cited, neither Mr. Kennedy nor Ms. Hood testified that they did business with Livingston or his new company. Therefore, the evidence referenced does not establish Livingston "appropriated" any business opportunity.

     [7]Although the fourth issue in Appellant's brief is phrased to address whether Livingston's conduct caused harm to NSS as an entity, Appellant also argues, in that portion of the brief, Livingston's conduct caused injury to its property.

combinations, constitute property.' *Id.* at 276."[8]  (Appellant's Br. 7.)  NSS claims Michigan has

defined "property" broadly and does not require property interests to be enforceable under law.  NSS

reasons it had a legal or equitable interest in its contracts with the two consultants, as well as the

business relationship and expectancies with those consultants.

NSS' reliance on 11 U.S.C. § 541(a)(1) is misplaced.  Whenever a case is commenced under

Title 11, Chapters 301 (voluntary), 302 (joint), or 303 (involuntary), an estate is created.  11 U.S.C.

§ 541(a).  The property in the estate comprises "all legal or equitable interests of the debtor in

property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  The provision does not

define "property," it identifies what constitutes the estate of a debtor.[9]  A court would need to look

elsewhere in order to determine what constitutes property in order to determine whether the legal

and equitable rights to that property belong in the debtor's estate.  *See In re Marshall*, 550 F.3d

1251, 1255 (10th Cir. 2008) ("'For purposes of most bankruptcy proceedings, property interests are

created and defined by state law.  Once that state law determination is made, however, we must still

look to federal bankruptcy law to resolve the extent to which that interest is property of the estate'"

(quoting *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1197 (10th Cir. 2002)

(citations and quotations omitted in original)); *see also In re Bergman*, 467 F.3d 536, 538 (6th Cir.

2006).

Whether Livingston's debt to NSS arises from an  injury to NSS' property requires looking

---

[8]The sentence as been quoted to illustrate both Appellant's position and the court's
frustration.  Setting aside the lack of a pinpoint citation to a more than 25 page Supreme Court's
decision, nowhere in the *Craft* opinion is section 541, let alone the Bankruptcy Code, mentioned.
The issue in *Craft* concerns the Tax Code, specifically the tax lien statute, 26 U.S.C. § 6321.
The "bundle of sticks" reference is made on page 278 of the opinion, not page 276.

[9]This conclusion is consistent with the bankruptcy judge's comments about § 541(a)(1).

to Michigan law.  "Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."  *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000). "Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."  *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946) ("[w]hat claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition for bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law.")

When faced with the need for a definition of "property," Michigan courts have relied on Black's Law Dictionary, where property is defined as  "the right to possess, use and enjoy a determinate thing (either a tract of land or a chattel); the right of ownership."  1252 (8th ed. 2004). *See e.g.*, *Risko v. Grand Haven Charter Twp. Zoning Bd. of Appeals*, 284 Mich. App. 453, 460, 773 N.W.2d 730, 735 (2009) (quoting the definition of "property" from the eighth edition of Black's Law Dictionary); *see Adams Outdoor Advertising v. City of East Lansing*, 463 Mich. 17, 33, 614 N.W.2d 634, 642 (2000) (quoting the definition of "personal property" from the 6th edition of Black's Law Dictionary); *People v. Fox*, 232 Mich. App. 541, 553, 591 N.W.2d 384, 391 (1998) (quoting the 6th edition of Black's Law Dictionary for the definitions of "personal property"and "real property").  The Michigan Supreme Court has noted "that the usual and customary meaning of property includes intangibles."  *Michigan Bell Tel. Co. v. Dep't of Treasury*, 445 Mich. 470, 479, 518 N.W.2d 808, 812 (1994).  Discussing entitlements, at least one Michigan court has distinguished

property interests from expectations. *Bukhtia v. Bureau of State Lottery*, 190 Mich. App. 323, 328, 475 N.W.2d 475, 478 (1991) ("[s]ince the United State Supreme Court's decision in *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 594 (1972), the definition of property has centered on the concept of 'entitlement.'  'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.'" (quoting *Roth*, 408 U.S. at 577)).

NSS has not established the bankruptcy judge's conclusion that the business relationships did not constitute property injured by Livingston's conduct was contrary to law.  NSS has not demonstrated that Michigan would consider the business relationships as NSS' property.  Michigan may define "property" broadly and may extend the definition to intangibles.  At the same time, Michigan courts recognize the need to limit the definition of "property" and have drawn a line to exclude mere expectations of a benefit from property.  Aside from the broad definition, NSS has not offered any authority, from Michigan or otherwise, suggesting this business relationship or expectancy constitutes property for the purpose of § 523(a)(6).

Although NSS may have a contract with the two consultants, the debt at issue does not arise from a breach or interference with those contracts.  As determined by the jury in state court, Livingston intentionally interfered with NSS' business relationships and expectancies. See Question No. 9 of Verdict Form.  NSS' historic relationship with certain consultants was disrupted and future, unspecified, business opportunities with those consultants were lost and NSS suffered economic damage.  See Question No. 10 of Verdict Form.  The distinction between the two intentional interference torts is not a red herring, but the crux of this issue.  NSS had the opportunity to assert and to prove that Livingston committed the tort of intentional interference with a contract, but opted

not to do so in state court.  Instead, NSS claimed, and successfully persuaded a jury, that Livingston intentionally interfered with a business relationship or expectancy.

The holding in *Sullivan* does not resolve the question.  In *Sullivan*, the court considered § 523(a)(6) and concluded, when Sullivan usurped the opportunity to provide a needs analysis for ASR for his employer, his conduct amounted to a willful and malicious injury.  The *Sullivan* court limited the nondischargeable debt to only the injury sustained relating to the lost opportunity to provide a needs analysis, rather than to the injury relating the subsequent business expectancies.  The court found the employee's conduct fell under the nondischargeability exceptions, but did not discuss the "property" issue.  *See In re Vitogiannis*, 2009 WL 1372065, at * 10 n. 9 (Bankr. N.D. Ill. May 15, 2009) (discussing *In re Livingston*).

### 2.  Willful and Malicious Injury to NSS

The bankruptcy court also concluded the debt did not fall under the entity prong of the exception.  The court reasoned, "[t]here is no question that NSS suffered a substantial loss because of Mr. Livingston's deceit.  However, Mr. Livingston's misconduct did not harm NSS per se; rather it harmed the relationships NSS enjoyed with its consultants."  *In re Livingston*, 379 B.R. at 721.  This assertion misconstrues the essence of the tort committed.  The bankruptcy court rejected an interpretation of § 523(a)(6) which would find a debt nondischargeable simply because the creditor's injury, the result of the debtor's willful and malicious conduct, could be reduced to a dollar amount.  *Id.* at 720.  This is true as far as it goes.

NSS contends the bankruptcy court erred because Livingston's conduct caused it to suffer both the loss of business relationships as well as business expectancies.  NSS points to testimony from Mr. Crawford and Mr. Sherer who explained "the extent of the losses NSS suffered after

17

Debtor's company was formed." (Appellant's Br. 9.) NSS disagrees with the bankruptcy court's interpretation of § 523(a)(6). NSS asserts the distinction between causing economic harm to the entity, as opposed to the entity's relationships, is a distinction without a difference. This court concurs.

Livingston's conduct, intentional interference with a business relationship, constitutes a willful and malicious injury to NSS under § 526(a)(6).[10] Again, the court begins by determining the injury suffered. As determined by the jury in state court, Livingston intentionally interfered with NSS' business relationships and expectancies. Michigan courts have described the tort in the following manner.

> "The basic elements which establish a prima facie tortious interference with a business relationship are the existence of a valid business relationship (not necessarily evidenced by the existence of a valid contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage *to the party* whose relationship or expectancy has been disrupted. One is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another" [Emphasis supplied & Italics]

*Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.*, 83 Mich. App. 84, 93, 286 N.W.2d 296, 299 (1978) (quoting 45 Am.Jur.2d, Interference, s. 50, p. 322); *see also Winiemko v. Valenti*, 203 Mich. App. 411, 416, 513 N.W.2d 181, 184 (1994) (noting subsequent panels have consistently upheld the elements of a tortious interference claim outlined in *Northern Plumbing*). As a result of Livingston's actions, NSS lost future, unspecified, business opportunities. The jury concluded the

---

[10]Because the court finds the debt is not dischargeable under § 523(a)(6), the court need not address whether the bankruptcy court is obligated to follow the holdings issued by the Sixth Circuit Bankruptcy Appellate Panel in *In re Sarff*, 242 B.R. 620 (B.A.P. 6th Cir. 2000).

damages suffered by NSS amounted to $1,800,000.00.

Section 523(a)(6) creates an exception for the ability to discharge a debt under bankruptcy law when the debt arises from an injury caused by the debtor's willful and malicious actions. Accordingly, a willful and malicious action is the initial factual predicate.   In this sense, the court agrees with the bankruptcy court's statement that "mere entitlement to an economic recovery is not enough to establish dischargeability under § 523(a)(6)." *In re Livingston*, 379 B.R. at 721.  The proper initial focus of the exception is on the conduct of the debtor, which must be both willful and malicious. *See Geiger*, 523 U.S. at 61-61.  Section 523(a)(6) is not limited to debts arising from noneconomic injuries.  The plain language of the statute creates a dischargeability exception for all willful and maliciously-imposed injuries (1) to an entity or (2) the entity's property. *See In re Leist*, 398 B.R. 595, 607 n. 12 (Bankr. S.D. Ohio 2008) (disagreeing with the interpretation of § 523(a)(6) in *Livingston* as inconsistent with the intent and language of the statutory provision).  Vandalism and arson injure property of an entity, while battery and defamation injure the entity.  Damages are calculated on the basis of the extent of the injuries.  The fact that the entity is the recipient of the damage award when property, rather than the entity, is injured in a particular hypothetical case does not render the phrase "or to the property of another entity" as surplusage.  The entity's property, such as equipment, has no standing to sue.  The suit for damage is initiated by the entity.  If the phrase "or the property of another entity" had been omitted, willful and malicious injuries to such equipment would not fall under the exception.  The entity who owns the equipment may be owed a debt for malicious and willful injury, but the debt would be dischargeable.

The bankruptcy court's distinction between injury to an entity and an injury to a relationship is a distinction without a difference, at least within the confines of this case.  Under Michigan law,

when the entity loses business opportunities as the result of another's willful and malicious interference, the entity has been injured and is entitled to a damage award as calculated by the jury (in this case $1.8 million). *See Northern Plumbing,* 286 N.W.2d at 299. Within the Sixth Circuit, courts have found the following types of conduct satisfy the willful and malicious injury of an entity: intentional infliction of emotional distress,[11] malicious prosecution,[12] intentional libel,[13] defamation per se,[14] assault and false arrest.[15]  *See Best,* 109 F.App'x at 5 (collecting cases).  As is obvious from these torts, injury to an entity under § 523(a)(6) is broader than mere physical injury.  The bankruptcy court's distinction erodes further when the entity at issue is a corporation.  Corporations have no corporeal body and can suffer no physical harm.  Libel and defamation cause injuries to a corporation in much the same manner as intentional interference with a business relationship would. *Cf. Northland Wheels Roller Skating Ctr., Inc. v. Detroit Free Press*, 213 Mich. App. 317, 328-29, 539 N.W.2d 744, 780 (1995) ("A corporation may successfully assert a cause of action for defamation if it operates for profit 'and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it . . . .'  Also, 'language which casts an aspersion upon its honesty, credit, efficiency, or other business character may also be actionable.'  'Where a libel contains an imputation upon a corporation in respect to its business, it ability to do business, and its

---

[11]*In re Moffitt*, 252 B.R. 916, 922-23 (B.A.P. 6th Cir. 2000).

[12]*In re Abbo*, 168 F.3d 930, 931 (6th Cir. 1999).

[13]*Wheeler,* 783 F.2d at 615.

[14]*In re Kennedy*, 249 F.3d 576, 582-83 (6th Cir. 2001).  *But See In re Rich*, 401 B.R. 281, 287-88 (Bankr. S.D. Ohio 2009) (finding there was no evidence that the defamation was willful and malicious).

[15]*Hardin v. Caldwell*, 1990 WL 20457, at 5 n.9 (6th Cir. Mar. 6, 1990).

methods of doing business, the same becomes libelous per se.'" (alterations and citations omitted)).

<u>CONCLUSION</u>

"This is not the case of an 'honest but unfortunate' debtor." *Sarff*, 242 B.R. 620, 629 (B.A.P. 2000) (quoting *Grogan*, 498 U.S. at 287). Livingston, a vice president of NSS, left NSS and induced several of the companies doing business with NSS to end their relationships with his former employer. At trial, a jury awarded NSS $1,800,000.00 in damages for the injuries suffered as the result of Livingston's conduct. The bankruptcy court correctly held the debt owed NSS does not fall under § 523(a)(2) or (a)(4) of the nondischargeability provisions of the bankruptcy code. However, the debt Livingston owes NSS does fall under § 523(a)(6) of the nondischargeability provisions of the bankruptcy code. For the reasons provided above, the bankruptcy court's decision is **REVERSED.** The action is **REMANDED** to the Bankruptcy Court for further resolution consistent with this opinion.

Date:   December 28, 2009                      /s/ Paul L. Maloney
                                               Paul L. Maloney
                                               Chief United States District Judge